## BRELSFORD v. WHITNEY TRUST & SAVINGS BANK et al.

### No. 7007.

Circuit Court of Appeals, Fifth Circuit.

March 14, 1934.

492

S. C. Kearley, H. C. Fisher, and A. L. Rankin, all of West Palm Beach, Fla., for appellant.

Egbert Beall and Jos. D. Farish, both of West Palm Beach, Fla., W. P. Hughes, U. S. Atty., and Raymond F. Brown, Sp. Asst. to U. S. Atty., both of Miami, Fla., for appellees.

Before BRYAN, SIBLEY and WALKER, Circuit Judges.

SIBLEY, Circuit Judge.

The United States had on record a lien for taxes against lands in Florida of E. M. Brelsford, a citizen of that state. Whitney Trust & Savings Bank, a corporation of Louisiana, and John J. Dutel, a citizen of Florida, were trustees in a mortgage given by Brelsford to secure three notes for $36,000 each made by one Dunkle and indorsed for accommodation by Brelsford; the notes being owned by certain banks and a certain citizen of New Orleans, La. Proceeding under 26 USCA § 136 (b), the trustees on October 14, 1931, brought in the District Court where the lands lay a bill to adjudicate the status of the tax lien and to foreclose the mortgage and sell the property, making the United States and Brelsford parties defendant. Dunkle was not made a party for the reason that he had been discharged in bankruptcy from the debt and had no interest or title in the land. The United States answered, setting up the tax lien, but on December 31, 1931, Brelsford paid off the lien, and their answer was amended to allege this fact and to disclaim any further interest in the land and to consent to the suit proceeding ex parte so far as the United States were concerned. Brelsford then answered that the bill should be dismissed for want of federal jurisdiction and because the note owners who held other collateral securities for which they should account were not parties; and set up that his indorsements were without consideration and procured by fraud. The court retained the case and decreed for the complainants. Brelsford appeals, having summoned and severed the United States, and contends that there is no federal jurisdiction, that the noteholders are indispensable parties, that Dunkle was erroneously held an incompetent witness to the fraud asserted, and that that defense was established.

That federal jurisdiction existed under 26 USCA § 136 (b), when the bill was filed, although there was no diversity of citizenship, is not denied. The claim is that, after the tax lien was satisfied and the United States disclaimed any further interest in the controversy, 28 USCA § 80, required dismissal, since it thus appears that "such suit does not really and substantially involve a dispute or controversy properly within the jurisdiction of said district court." The United States were not dismissed from the suit. The suit remained one in which they were a party within the literal words of article 3, § 2, of the Constitution. In Whitney Trust & Savings Bank et al. v. Brelsford (C. C. A.) 63 F.(2d) 880, a similar case between these same parties, but involving different property, we affirmed a dismissal, but there the tax lien had been paid off before instead of after the suit was filed. That difference is vital. Federal jurisdiction in such a connection depends on the state of facts when the suit is filed, and is not lost by a change in the facts afterwards. Ford, Bacon & Davis v. Volentine (C. C. A.) 64 F.(2d) 800. Were we to hold otherwise, Brelsford could by a voluntary payment at any time prior to the decree and possibly prior to a sale under it destroy the court's power to proceed and annihilate all that had been done. The words above quoted from 28 USCA § 80, refer to the existence of a real and substantial controversy within the court's jurisdiction at the time its jurisdiction was invoked, whether by the filing of an original suit in it or by the removal of one from a

state court to it. We make no ruling as to jurisdiction under 26 USCA § 136, to render a deficiency decree in this case, none having yet been rendered.

As to parties, the trustees were the mortgagees, who ordinarily are the only necessary complainants in a foreclosure. But the existence of other security in the hands of the noteholders makes a difference. Brelsford had a right to have applied to the debt all credits arising from this source before his property should be sold. This other security included a great mass of notes and mortgages which had been for three years in the hands of the noteholders and on which they should have made collections. An account of them was in order before the noteholders could ask through their trustees a decree of foreclosure and sale. Had these noteholders been within the jurisdiction of the court, they would have been proper parties, but, since they did not appear voluntarily and were not accessible to the court's process, and since their trustees did offer an account of the securities, we think the court was in a position to do justice without their presence. Equity Rule 39 (28 USCA § 723). It is urged, however, that, had the noteholders been parties, they might have been interrogated under Equity Rule 58 (28 USCA § 723). But the court's power to interrogate them by other means was ample. The persons subject to interrogation as it turned out testified in the trial.

The court erroneously held Dunkle to be an incompetent witness as to what happened between Brelsford and Cornish under Comp. Gen. Laws of Florida, § 4372. That statute nullifies the common law disqualification of a witness by reason of interest in the event of an action or because he is a party to it, but makes the proviso: "That no party to such an action or proceeding, nor any person interested in the event thereof * * * shall be examined as a witness in regard to any transaction or communication between such witness and a person at the time of such examination deceased, insane," etc. Dunkle was not a party to this suit. He was not interested in it in the sense in which at common law and under this statute one is disqualified to testify because of interest. Shoemaker v. Powers, 78 Fla. 20, 82 So. 751. He was discharged from the debts in question, and had no title to the mortgaged property. The decree to be rendered would not be evidence for or against him in any other suit. Although Brelsford was his father-in-law and his wife might hope to be an heir of Brelsford, and there was strong human interest to protect the accommodation indorser on his note, there was no direct present financial interest which would disqualify.

But the testimony of Dunkle was fully taken and is in the record. Given all the weight which could be accorded it, we find it insufficient in the light of the other evidence to establish a defense for Brelsford. Stripped of unimportant details, the situation was this: One Cornish and the New Orleans bankers had engaged together to reopen a failed bank at West Palm Beach, Fla., and to advance each a third of the assessments on certain former stockholders. The New Orleans bankers were dissatisfied with the security offered for the advance, and declined to go forward, and Cornish furnished the money himself. The transaction came finally in October, 1927, to where Cornish held three notes payable to him for $40,000 each, signed by Dunkle and secured by a large amount of the bank's stock and about $100,000 in notes and mortgages. The bank was not prospering, and the collection of the mortgages proved slow, and Cornish was desirous of getting in some of his money. He proposed to Dunkle to aid Dunkle in borrowing of the New Orleans bankers $125,000 which Dunkle needed if Dunkle would get his father-in-law, Brelsford, who was a wealthy man, to indorse renewals of Dunkle's notes to Cornish so that Cornish could get the New Orleans bankers to take two of them as at first planned. Brelsford was seventy-four years old and in poor health, and trusted Dunkle, being ignorant of the understanding between him and Cornish, and acceded to the request for the indorsements under circumstances thus stated by Dunkle: "I mentioned to Mr. Brelsford the matter of assisting Mr. Cornish to get this money, and discussed the proposition of Mr. Brelsford indorsing the notes. Mr. Cornish also talked to him about the notes, and explained the collateral that was back of the notes, and that it would be a great accommodation to him to have Mr. Brelsford to indorse them so that there would be no difficulty in submitting this collateral to the New Orleans bankers to get their share of the two-thirds which they were ready and willing to give him. * * * Mr. Cornish at this conference told Mr. Brelsford there was plenty of collateral behind the notes and that with the bank stock there was more than sufficient to pay them off, just a matter of convenience to him in turning over two-thirds of it to the New Orleans people so he could get his money. * * * The collateral was not exhibit-

ed to him at that time. It was in the bank, and he just took Mr. Cornish's word for it, and I consented to it."

The notes indorsed that day were not used, but a few days later, on October 25, 1927, three others were signed in their place and indorsed, each for $40,000 due May 23, 1928, one payable to the order of Cornish, one to the order of Interstate Trust & Banking Company, and one to the Marine Bank & Trust Company. For the latter two on November 27, 1927, the bankers paid Cornish full principal and interest by checks. Cornish retained the third note payable to himself, but later put it up as collateral security with the New Orleans banks, and it was afterwards reduced to their ownership for value. These notes were not paid at maturity. The reorganized bank of which Brelsford was also a stockholder failed about that time, and the bank stock which was part of the collateral became worthless; Brelsford necessarily knowing it. The notes were not renewed, but were carried over until November 5, 1928, when, Cornish having killed himself, Dunkle renewed them to the then holders, Brelsford again indorsing, the notes now being $36,000 each due in three months with 7 per cent. interest. On November 15, 1928, in a conference with Brelsford, it was agreed to extend their maturity to February 5, 1931, and to reduce the rate of interest to 6 per cent. in consideration of Brelsford's securing them by the mortgage under foreclosure. Aside from questions of innocent holding for value without notice under the law merchant, we think Brelsford is in no position to assert fraudulent misrepresentation by Cornish as to the collateral and abuse of his confidence in Dunkle as against the New Orleans bankers. As to the two notes of October 25, 1927, payable to the banks, his indorsement on them was given with the very purpose on his part of inducing these payees to take them, and they paid full value for them. The consideration is ample to sustain the indorsements, although Brelsford personally got no benefit. Burton v. McCaskill, 79 Fla. 173, 83 So. 919. If Brelsford was induced to indorse by conduct on the part of Cornish and Dunkle which as against them would be fraudulent notwithstanding Brelsford's manifest negligence, the fraud would not affect these payees who did

not authorize, participate in, or know of it, but who paid value on the faith of Brelsford's signature. Cason v. Cason, 116 Tenn. 173, 93 S. W. 89; Equitable Life Assurance Society v. Cosby (Ky.) 126 S. W. 142; Publishers: George Knapp & Co. v. Wilks, 105 Ark. 243, 151 S. W. 280; Williston on Contracts, § 1518; 13 C. J. Contracts, § 287.

An effort is made to show that Cornish was acting as agent for the New Orleans bankers in Florida. This may be true as to the general handling and management of the affairs of the reorganized bank of which Cornish was made president, but Cornish was handling these notes of Dunkle for himself. The bankers assert and the circumstances show that Cornish was not their agent in respect of them. Dunkle's own account of the indorsement shows that the New Orleans bankers were not parties to what he and Cornish were doing, but that the latter were planning each to get a large amount of cash from them. What Cornish and Dunkle said and did to get Brelsford to indorse was not done actually or professedly as agents for the New Orleans parties nor with their knowledge. The third note which was payable to Cornish stood differently and was attackable in his hands. We cannot tell certainly whether it was first pledged to the banks by Cornish before or after dishonor. But, irrespective of that, we think the renewal of it to the present holders in November, 1928, after Brelsford must have known that the collateral bank stock was worthless and after the other collateral had produced almost no return, cannot be said to have been on the faith of the original misrepresentation of the value of the collateral. The mortgage itself was a new contract demanded because of the insufficiency of the original security, and was in the nature of a settlement whereby Brelsford was to get, and has gotten, two years' additional time on the debt and a reduction of 1 per cent. in interest. Nearly a year after the mortgage was given, during which Brelsford had been called on to pay, and had paid, the interest on the notes, and must have fully known the worthlessness of the collateral, he voluntarily acknowledged the mortgage for record, again confirming and ratifying it. He is bound by it.

Judgment affirmed.