Argued September 29, reversed November 10, 1954

# CERINO *v.* OREGON PHYSICIANS' SERVICE

276 P2d 397

*H. Lawrence Lister* argued the cause for appellant. On the briefs were Gray & Lister, of Portland.

*Walter J. Cosgrave,* of Portland, argued the cause for respondent. With him on the brief were James G. Smith and Maguire, Shields, Morrison & Bailey, of Portland.

REVERSED.

LUSK, J.

This is an appeal by the defendant, Oregon Physicians' Service, a corporation (hereinafter referred to as O.P.S.), from a judgment for plaintiff in an action upon an alleged contract of indemnity whereby the defendant agreed, in consideration of "specified monthly dues" to be paid by the plaintiff, to pay the cost of hospital expenses incurred by the plaintiff in connection with any illness of her minor son, Louis L. Cleaver.

The action was commenced in the District Court for Multnomah County where plaintiff recovered a judgment for $656.90, the full amount of the hospital expenses as alleged in the complaint and $200.00 attorneys' fees. Defendant appealed to the Circuit Court,

and a jury trial there resulted in a judgment for plaintiff for $656.90 and $450.00 attorneys' fees.

The complaint contains the following allegations:

"II.

"At all times hereinafter mentioned, the defendant was, and now is, carrying on a hospital insurance business to provide for indemnity by the defendant to certificate holders for the cost of medical and hospital services.

"III.

"On or about the 1st day of March, 1949, the plaintiff entered into a contract with the defendant whereby the defendant agreed to pay the cost of medical and hospital expenses incurred by the plaintiff in connection with any illness, sickness, injury, or physical condition of plaintiff or members of her family. In consideration thereof the plaintiff, as a member of the defendants' association, agreed to pay to the defendant certain specified monthly dues.

"IV.

"Plaintiff, at all times on and after March 1, 1949, and continuing to and including September 1, 1950, paid all monthly dues owing to the defendant at the time the same became due, and duly performed all the terms and conditions of said contract on her part to be performed.

"V.

"While said contract was in full force and effect, plaintiff's minor son suffered from certain sicknesses and ailments; namely, a bladder obstruction and an injured kidney, and required medical, surgical and hospital care and treatment and as a result thereof plaintiff incurred expenses for hospital services and care in the amount of $656.90."

The answer contains the following admissions and denials:

## "II.

"Denies each and every allegation and the whole of paragraph II.

## "III.

"Admits that on or about March 1, 1949, plaintiff entered into a contract with defendant whereby the defendant agreed to provide medical and hospital services for plaintiff and that plaintiff, as a member of Oregon Physicians' Service, agreed to pay to defendant certain specified monthly dues. Except as herein specifically admitted, denies each and every allegation and the whole of paragraph III.

## "IV.

"Admits that plaintiff paid all dues owing to defendant on her contract with defendant between March 1, 1949, and September 1, 1950. Except as herein specifically admitted, denies each and every allegation and the whole of paragraph IV.

## "V.

"Admits that between March 1, 1949, and September 1, 1950, it was discovered that plaintiff's son suffered from a bladder obstruction and that he required medical, surgical and hospital care and treatment and defendant admits that plaintiff incurred expenses for hospital services and care, the amount of which is not known to defendant. Except as herein specifically admitted, defendant denies each and every allegation and the whole of paragraph V."

As disclosed by the foregoing portions of the pleadings the main issue was whether defendant entered into a contract with plaintiff to pay to plaintiff the cost of hospital expenses incurred by her on account of the illness of her son. On the trial defendant, by motions for a nonsuit and directed verdict, challenged the sufficiency of the evidence to prove the contract alleged.

The court's rulings denying these motions are assigned as error, and consideration of these assignments calls for a statement of the evidence.

Plaintiff was an employee of the United States Internal Revenue Bureau in Portland. Her husband was in ill health, and she supported him as well as her minor son by a former marriage, Louis L. Cleaver. Before the trial the plaintiff was divorced from her husband, M. J. Cerino, and resumed the name of her first husband, which was Cleaver. The son, Louis, died before this action was brought. For convenience we will refer to the plaintiff as Mrs. Cerino.

For a number of years prior to February, 1949, a group contract had been in existence between the O.P.S. and a number of the employees of the Internal Revenue Bureau where Mrs. Cerino worked, under which O.P.S. agreed, for a stated consideration, to make available to members of the group and to bear the expense thereof certain medical and surgical services, hospital accommodations, etc. Mrs. Cerino was not at that time a member of the group, but had hospital coverage for her son, and apparently for herself, under what is referred to in the record as the Blue Cross.

In February, 1949, Mr. George H. Montgomery, a representative of O.P.S., called at the office of the Internal Revenue Bureau, where Mrs. Cerino was employed, for the purpose of explaining to the employees O.P.S. coverage and securing additional members for the office group contract. According to plaintiff's testimony Montgomery told the employees that O.P.S. gave the same hospital coverage as Blue Cross, and further that it paid the expenses of office calls on a doctor, which was not included in Blue Cross coverage. She decided to drop the Blue Cross and come under the

O.P.S. group contract and to obtain O.P.S. coverage also for her husband and son. She testified:

"Q  Did you have any personal discussion with him [Montgomery]?

"A  Yes, I did. I asked him, you know, questions about it. The main thing was about the hospital coverage. I told him I already had hospital coverage. He said I would have the same under the OPS that I had had with Blue Cross.

"Q  Did you ask him about the coverage for your son?

"A  Yes, I did, because at that time I wasn't married and I was—no, I was married then, too, but I was the only one that was working and so I naturally asked him about my family because I had to pay the bills so I wanted my family covered.

"Q  And did he tell you that your son would be covered?

"A  Yes."

As we have seen, it is admitted in the pleadings that the defendant agreed to provide medical and hospital services for the plaintiff. The defendant introduced in evidence an executed copy of a group contract between O.P.S. and employees of the Internal Revenue Bureau. This contract, according to the testimony of C. W. Kincaid, claims supervisor for O.P.S., was the only group contract in effect on March 1, 1949, with employees of the Internal Revenue Bureau. Kincaid testified that it contained no provisions for coverage of members of an employee's family, and the plaintiff conceded in her testimony that it did not cover her husband and her son. She further testified:

"Well, after I talked to Mr. Montgomery then I decided to take the—you know, to change over and take this other coverage because I felt I would get— for very little more premium I felt I would get more for the family as well. I was covered as a

family, you know, under the Blue Cross, and so I changed over and then from then on I paid my dues to one of the other girls in the office who collected the OPS dues, and I paid Mike's and Louis' dues to the—they aren't dues, they are your premiums—to the same girl; however, she put them in another envelope and sent them down separately, but I did pay them separately.''

As part of her proof the plaintiff introduced in evidence a printed card issued by O.P.S. entitled ''Membership Identification Card'', which has no relevance to any claim for hospitalization of plaintiff's son, Louis, but discloses only that M. E. Cerino (the plaintiff), an employee of the Internal Revenue Bureau, ''is entitled to medical and hospital services during the period for which dues are paid'' under ''the Commercial Coverage Contract in effect for the benefit of subscribing employees of the employer named''. Plaintiff also introduced in evidence a portion of a printed ''certificate'' issued by O.P.S. which relates to medical and hospital services for M. J. Cerino and Louis L. Cleaver. Mrs. Cerino admitted in her testimony that this document, marked Exhibit 1 in the record, was only part of a larger document that was sent either to her or her family, and the certificate indicates on its face that such was the fact, for it recites:

''That, subject to all terms and conditions hereinafter set forth, which are made a part of this certificate, Oregon Physicians' Service, sometimes hereinafter called O.P.S., an Oregon Corporation having offices situated at Salem, Portland and Medford, in the State of Oregon, and being licensed to conduct the business of an hospital association under the laws of the State of Oregon, hereby agrees to procure, and make available, at the expense of O.P.S., the hereinafter stipulated services to the

following person or persons, specified hereinafter as 'member' or 'members' ".

It is then stated that "Only Specified Persons are Covered Hereunder", and, following this language, is the name CERINO M J as "Principal Member or Certificate Holder", then the number and effective date of the certificate (being March 1, 1949), the amount of the quarterly dues paid, and, under the words "Family Members Covered" the name "Louis L. Cleaver, Son". The remainder of this document, which presumably set forth "the hereinafter stipulated services" and the "terms and conditions hereinafter set forth", was never produced by the plaintiff, although, at the court's suggestion, she made a search for it in her home during the trial, nor did she offer secondary evidence of its contents. This deficiency in the evidence the defendant undertook to supply. Its witness, George H. Montgomery, identified a certificate (Exhibit 8) in use by O.P.S. at the time in question consisting of four segments which can be folded so as to be of convenient size to carry in one's pocket. One of these segments is identical with Exhibit 1 save for a different address of defendant's Portland office and that the blanks have not been filled in. Another is a "Membership Identification Card", which certifies that "The Insured persons listed herein are entitled to" O.P.S. services. On the back of this card it is stated:

> "The summary on the reverse side of this identification card is not a contract, nor does it include all the provisions of the Service Certificate to which this card was attached. Each member's benefits are expressly subject to all additional provisions of the Service Certificate and to O.P.S. rules and regulations governing the rendering of medical and hospital services."

The card (so attached to the remainder of the certificate as to be readily separated from it) is obviously intended for use by a member of O.P.S. as a means of identification. The printed matter on the remainder of Exhibit 8 consists of detailed provisions stating the medical and surgical services and hospital care which O.P.S. agrees to procure and pay for, "service prerequisites and limitations", and provisions respecting dues, etc.

Confronted with Exhibit 8, on cross-examination, the plaintiff testified as follows:

"Q  Now I would like to have you compare Exhibit 1 with that segment of the contract and see if there is any other difference between the two as far as you can see?

"A  No, it seems to be the same.

"Q  And at this time you aren't in a position to say that when this document, which is marked Plaintiff's Exhibit 1 for identification, came to you it was the segment to which your attention has been called in Defendant's Exhibit 8 for identification, are you?

"A  Well, it seemed to me that it was, like I say, a piece of paper like that, I mean a folded paper, but I can't remember—

"Q  In other words,—I beg your pardon.

"A  —whether I tore it apart or whether somebody else did, except they told me to give the family part, the other part. Who tore it apart I don't know.

"Q  Now you do believe, and it confirmed what you said this morning, that when you got this paper, which is Exhibit No. 1—

"A  Uh-huh.

"Q  —it was a part of a document and you tore it apart to give part to your husband?

"A  Uh-huh.

"Q  And to keep part yourself; is that correct?

"A  I think so, yes."

Testimony on behalf of the defendant is to the effect that, according to the records of the defendant, the only contract it had to pay benefits to Louis Cerino was a printed contract for family coverage for M. J. Cerino and Louis Cerino, identical with Exhibit 8, and that billings were sent to M. J. Cerino at his home address.

The foregoing, we believe, is a fair summary of all the evidence bearing on the question raised by the motions for nonsuit and directed verdict.

■ It cannot be definitely determined from a reading of the complaint whether the plaintiff intended to rely on an oral or a written contract of insurance or a contract partly oral and partly written. Her testimony, however, would indicate the first, as she produced no written contract, but only a portion of a written contract (Exhibit 1), and her counsel objected to the admission in evidence of what the defendant claimed to be a copy of the remainder of this document. She also produced the O.P.S. "Membership Identification Card" issued to her as a subscribing employee under the Internal Revenue Bureau group contract. But this has to do with an entirely different contract from the one on which this action is brought. Standing alone, Exhibit 1 does not establish a written contract with anyone, for, as we said in *Spande v. Western Life Indemnity Co.*, 61 Or 220, 236, 117 P 973, 122 P 38:

"* * * It is a rule of construction of contracts that, where an instrument refers in terms to another instrument as containing part of the stipulation between the parties, that other instrument is itself a part of the contract between the parties, and must be produced, in order to fully substantiate the allegation regarding the agreements of the contracting parties."

This doctrine applies with even greater force here, because Exhibit 1 does not merely refer in terms to

"another instrument", but is obviously and on its face a part of an agreement to furnish services, of a kind and to an extent not specified, to a person or persons not named, for a period of time and upon a consideration not disclosed, in Exhibit 1. The second appeal of the Spande case, 68 Or 171, 136 P 1189, which is cited by the plaintiff, was decided on different pleadings from those before the court on the first appeal, and by the application of the doctrine of estoppel. It leaves untouched—and could not have done otherwise—the rule of law above stated, and in no way supports the plaintiff's position.

The plaintiff asserts, and the defendant denies, that O.P.S. is in the insurance business. We need not determine that question. For the purposes of this case, it is sufficient to say that its contract bears such an analogy to a contract of insurance as to justify the court in applying here the law relating to the proof of oral contracts of insurance.

██ It is "well-settled law that a parol contract of insurance is valid in the absence of a statutory requirement or other positive regulation to the contrary, and this rule covers not only agreements to insure, but the completed contract", 1 Joyce on Insurance (2d ed) 148 § 31; *British Insurance Co. v. Lambert,* 26 Or 199, 202, 37 P 909; *Hardwick v. State Insurance Co.,* 20 Or 547, 553, 26 P 840. In *Cleveland Oil Co. v. Norwich Ins. Society,* 34 Or 228, 233, 55 P 435, we quoted with approval the following from Wood on Fire Insurance (2d ed) § 5:

"In order to make a valid contract of insurance several things must concur: First, the subject-matter to which the policy is to attach, must exist; second, the risk insured against; third, the amount of the indemnity must be definitely fixed; fourth,

the duration of the risk; and, fifth, the premium or consideration to be paid therefor must be agreed upon, and paid, or exist as a valid legal charge against the party insured where payment in advance is not a part of the condition upon which the policy is to attach. The absence of either or any of these requisites is fatal in cases where a parol contract of insurance is relied upon."

See, also, *Bird v. Central Mfg. Ins. Co.*, 168 Or 1, 7, 120 P2d 753; 1 Joyce, The Law of Insurance 204 § 43. As stated in the Cleveland Oil Company case:

"* * * It is not the duty of courts to make contracts for parties, but to interpret the engagements they have undertaken, and, in view of this legal principle, the rule is well settled that, before a contract of insurance or to insure can become binding, all these necessary elements must be understood, assented to, and agreed upon, either expressly or by implication, before there can be an absolute binding obligation between the parties".

In that case a judgment for the plaintiff (the alleged insured) was reversed because the evidence failed to show the term for which a policy of fire insurance was agreed to be issued. See cases cited in annotations, 96 ALR 236, 69 ALR 961, 15 ALR 999; 44 CJS 1020, Insurance § 250.

With respect to the quality of proof required the court said in the Cleveland Oil Company case:

"* * * When a parol contract of insurance is relied upon to sustain a recovery of damages resulting from a breach of the agreement, or to enforce a specific performance of the terms which have been mutually assented to, the existence of the contract must be conclusively established."

To the same effect see 1 Couch, Cyclopedia of Insurance Law 142 § 82.

Judged by these standards, the plaintiff's evidence falls far short of establishing a valid contract. There is neither allegation nor proof of the period of the risk or the amount of the insurance. To abandon the language of insurance contracts for the moment, it is not shown for what period of time the contract was to remain in effect nor to what extent, if at all, the defendant obligated itself to pay to plaintiff hospital expenses that might be incurred by her. In fact, the plaintiff did not testify to any promise by defendant's agent to pay her anything. He told her, according to her testimony, that the O.P.S. gave the same coverage as Blue Cross and that her son would be covered. The evidence tends to show that she told the agent that she wanted that coverage for her son and husband and that he agreed to provide it. But there is no evidence as to what the hospital coverage afforded by the Blue Cross is and there is nothing in the plaintiff's evidence which, either directly or by legitimate inference, supports the claim that the defendant agreed to indemnify her for hospital expenses which she might incur on account of the illness of her son.

We must consider, however, the effect of the evidence which came into the case at the instance of the defendant. We have held that in actions on an alleged oral preliminary contract for insurance "where nothing is stipulated in the preliminary agreement as it respects the kind or nature of the policy to be issued, the law presumes the parties contemplated the usual and ordinary policy employed by the company to cover property of like kind and nature as that designated in the agreement." *Sproul v. Western Assurance Co.*, 33 Or 98, 103, 54 P 180; and, in an action on alleged oral contract of insurance, that an agreement to insure. without specifying the premium to be paid, is a contract

to insure at the customary rates, and "the law will presume that the minds of the parties met upon an agreement containing the terms and conditions of a policy such as is usually issued by the contracting insurance company covering like risks". *Cleveland Oil Co. v. Norwich Ins. Society,* supra, 34 Or 236. See, also, Couch, op. cit., 124-125 § 77; 29 Am Jur 147, Insurance § 130.

These rules do not help the plaintiff's case. It may be regarded as proven that Exhibit 8 was the defendant's usual form of contract for the particular coverage involved in use in February and March, 1949. Summarized, it is an agreement on the part of O.P.S. to procure and make available at the expense of O.P.S. to certain named persons (designated "members"), and to such persons only, certain particularly described medical and surgical services and hospital care. It is provided that in cases which require hospital care all stipulated services shall be furnished to a member only when said member is a duly registered bed patient in an approved general hospital and under the care of a listed cooperating O.P.S. physician, surgeon or consulting specialist. The obligation to provide hospital care is limited to a period of 21 days for each particular physical disability arising from a separate and distinct cause; but in conditions necessitating hospitalization beyond 21 days O.P.S. agrees to pay or reimburse the costs of a hospital case in an amount not to exceed 50 per cent of such costs for a maximum period of 90 days immediately following said 21-day period. There are numerous other provisions, including those which stipulate the dues of members and the duration of the contract which is fixed at one year.

Considering Exhibit 1 as a part of a printed contract identical in its provisions with Exhibit 8 (as

we think it undoubtedly was), it is apparent that the only parties to the contract were O.P.S. and M. J. Cerino, the husband of plaintiff, as ''principal member or certificate holder'', and Louis L. Cleaver, her son, as a ''family member''. The contract does not even remotely suggest an obligation on the part of O.P.S. to indemnify plaintiff for the costs of hospital care of either of these persons, and, as we have seen, the plaintiff herself testified to no such agreement. If we treat this action as one upon a contract partly oral and partly in writing, under any view of the evidence, the most than can be gotten out of it is that Mrs. Cerino made an oral application to the defendant's agent to provide medical and hospital coverage for her husband and son, that the agent agreed to do so, and that in response defendant issued its usual contract in such cases—a contract which contains no such agreement as that upon which the plaintiff sues. The fact that she paid the dues or premiums is not of itself sufficient to import such a term into the contract.

It follows that the court erred in denying the motions for a nonsuit and a directed verdict.

We should add that this decision is without prejudice to an action on the contract by the estate of Louis L. Cleaver. The record shows that a claim submitted on his behalf was rejected by the defendant on the ground that services for congenital physical defects are expressly excluded by the terms of the contract. The defendant on the trial offered evidence in support of this defense, but the evidence was excluded because the exception had not been pleaded. Nothing in the present decision has any bearing on that issue.

The judgment is reversed with directions that judgment for the defendant be entered by the Circuit Court.