UNITED STATES FIDELITY & GUARANTY COMPANY, a corporation, Plaintiff,

v.

Murel LONG, Lawrence F. Gray, Lewis Furber, Hilbert G. Largent, Liskey Farms, Inc., a corporation, Oscar Denault, Leon Andrieu, George Andrieu, Regis Andrieu, Donald Jacobs, State of Oregon, Department of Agriculture, Commodity Credit Corporation of the United States of America, and William P. Adams, doing business as Adams Seed Co., Defendants.

Civ. No. 61–259.

United States District Court
D. Oregon.
Jan. 17, 1963.

Phillips, Poole & Dooley, William C. Ralston, Portland, Or., for United States Fidelity & Guaranty Co.

William Ganong, Klamath Falls, Or., for Murel Long.

Don Parker, Asst. Atty. Gen. of Oregon, Salem, Or., for State of Oregon, Department of Agriculture.

Victor E. Harr, Asst. U. S. Atty., Portland, Or., for Commodity Credit Corp.

Beesley & Murray, Richard C. Beesley, Klamath Falls, Or., Fitzgibbon & Nichols, John D. Nichols, Portland, Or., for Lewis Furber and Hilbert G. Largent.

Arthur A. Beddoe, Klamath Falls, Or., for Lawrence F. Gray and Liskey Farms, Inc.

J. Anthony Giacomini, Klamath Falls, Or., for Oscar Denault, Leon Andrieu, George Andrieu, and Regis Andrieu.

No appearance for Donald Jacobs.

No appearance for William P. Adams, doing business as Adams Seed Co.

KILKENNY, District Judge.

This is an interpleader action by plaintiff, surety on four warehouseman's bonds, three being issued pursuant to Oregon law, seeking a judicial construction of said instruments and declaratory relief as to the extent of its liability. The individual defendants are depositors of certain grain with defendant, William P. Adams, dba Adams Seed Co., operating warehouses in Klamath County, Oregon at Malone Siding and Midland. Defendant Liskey Farms is a corporation organized under Oregon law. Commodity Credit Corporation is organized under Federal law. Both corporations were depositors of grain in Adams warehouses.

Bonds issued by plaintiff for and on behalf of defendant Adams, and, here in controversy are as follows:

(1) Bond dated August 12, 1958 posted pursuant to ORS Chapter 586 [1]. This bond being for the sum of $5,000.00 covering the period commencing July 1, 1958 and ending June 30, 1959 covering storage of grain and other commodities. in Adams' warehouse at Midland.

(2) Bond dated June 18, 1959 posted pursuant to said Oregon Revised Statutes in the principal sum of $5,000.00 covering the period July 1, 1959 and ending June 30, 1960 on Adams' warehouse at Midland. By rider effective July 30, 1959 this coverage was extended to the warehouse at Malone Siding and by said rider the penal sum of the bond was increased to $9,500.00.

(3) Bond dated June 28, 1960 posted pursuant to said Oregon Revised Statutes in the principal sum of $9,000.00 covering the period commencing July 1, 1960 and ending June 30, 1961 effective on the warehouses at Midland and Malone Siding.

---

1. Oregon Revised Statutes, 586.300.

"(1) Each warehouseman operating any public warehouse required to be licensed under ORS 586.210 to 586.730, shall, *on or before July 1 of each year*, give a bond to the State of Oregon executed by the warehouseman as principal and by a surety company licensed to do business in the state as surety in such sum as the department requires. The bond must be approved by the department and conditioned upon the faithful performance by the warehouseman of the acts and duties enjoined upon him by law. *The liability of the surety upon such bond is limited to the amount specified in the bond.*

"(2) If recoveries are had by two or more persons for violation of the conditions of the bond in excess of the amount of the bond, the recovery shall be prorated and the total amount against the surety shall not exceed the amount of the bond."

(4) Bond issued by plaintiff on July 1, 1959 for $5,000.00 naming Commodity Credit Corporation as obligee. August 15, 1959 the penal sum of this bond was raised to $6,000.00 and on the same date the bond was extended to cover Adams state grain warehouse No. 210 at Malone Siding. This bond remained in force until cancelled by plaintiff on September 28, 1960. This bond secured performance of the Uniform Grain Storage Agreement between Commodity Credit and plaintiff.

During said year defendant, Adams, operated public warehouses at Midland and Malone Siding under and by virtue of said Oregon Revised Statutes and while so operating had the following transactions:

(1) Defendant, Murel Long, on December 30, 1959 delivered to defendant Adams for storage certain barley and on said day defendant Adams issued to Long a certain public grain warehouse receipt. Certain of said grain was redelivered to Long but the balance of the grain was converted by defendant Adams on or prior to June 30, 1960.

(2) Defendant, Lawrence F. Gray, between September 14th and September 30, 1959, both dates inclusive, delivered certain barley to Adams and on the 14th day of May, 1960 delivered certain wheat to Adams. The reasonable value of the wheat was credited to Gray's account. No warehouse receipt was issued and no written instruction or order was given or furnished by Gray to Adams with reference to said grain.

Between September 10th and September 30, 1960, both dates inclusive, Gray delivered certain oats to Adams. The wheat and barley were delivered to the Malone Siding warehouse and the oats was delivered to the Midland warehouse. No warehouse receipts were issued for any of the grain so delivered and no written order or instructions were given or furnished to Adams by Gray. Although demand was made no part of the grain was returned to Gray.

(3) Liskey Farms, Inc. on September 4th and 5th, 1959 delivered to Adams certain barley at Malone Siding warehouse. No warehouse receipt was issued for the grain. No written instructions or order was received or furnished by Liskey Farms with reference to said grain. On or about October 20, 1960 Liskey Farms made demand on plaintiff for payment of the sum of $1,567.31 based on the sale of the grain to Adams. Prior thereto and on or about the 15th day of May, 1960 Liskey Farms demanded return of the barley and Adams failed, refused and neglected to redeliver the same.

(4) a. Defendants, Regis Andrieu and Denault, between November 24, 1958 and January 12, 1959 delivered certain oats to Adams at the Midland warehouse and deposited the same without any written order or instructions and on December 15, 1958 Adams paid said persons for a substantial portion of said oats on an alleged purchase price of $2,850.00. Prior to June 30, 1959 said defendants demanded payment for the balance or redelivery of the balance of the oats, with which demands Adams failed to comply.

b. Defendant, George Andrieu, between August 18, 1958 and September 25, 1958 delivered certain oats to defendant Adams at the Midland warehouse. That said grain was deposited and delivered without written order on September 5, 1958 and on October 20, 1958 Adams paid for a substantial portion of said oats. Prior to June 30, 1959 Andrieu demanded payment of the balance of the purchase price or redelivery of the balance of the oats. Adams failed to comply with such demand.

c. Defendant, Leon Andrieu, between August 19, 1958 and September 21, 1958 delivered certain barley and certain oats to Adams at the Midland warehouse, which grain was deposited without written order or instructions. Demand has been made for payment of the amount due. That no part has been paid.

d. After Regis Andrieu, Oscar Denault, George Andrieu, and Leon

Andrieu had demanded the balance of the said grain from defendant and after defendant had refused to deliver said grain, or to pay therefor, and after said grain had been converted to Adams own use, said persons instituted action against Adams for the value of the grain and recovered judgments thereon. Said judgments remain wholly unpaid and satisfied. In the complaint in each of said actions, each defendant alleged that he had sold and delivered to defendant Adams the grain in question.

e. On September 15, 1960 Adams executed to Regis Andrieu, Oscar Denault, George Andrieu and Leon Andrieu promissory notes in the amount of the value of the grain, together with interest thereon, and executed in favor of said persons Second, Third, and Fourth Chattel Mortgages on certain personal property as security for the payment of said obligations. Said persons have made joint demand upon plaintiff under the bond covering the period July 1, 1958 and ending July 30, 1959 in the penal sum of $5,-000.00.

(5) Defendant Largent on August 11th and 12th, 1958 delivered certain barley to Adams at the Midland warehouse. About August 7, 1959 defendant Adams executed and delivered to defendant Largent a check in the sum of $500.00 in payment of 20,000 pounds of the barley so delivered. No written instruction or order was given or furnished by Largent to Adams nor was a warehouse receipt furnished to Largent.

(6) a. Defendant Furber, between September 24th and September 28, 1958 delivered certain oats to defendant Adams at the Midland warehouse. No written instructions or orders were given to defendant Adams with respect to the oats nor was a warehouse receipt issued.

b. Defendant Furber between October 2nd and October 7, 1959 delivered certain oats to defendant Adams at the Midland warehouse with oral instructions and orders for the processing and cleaning of the grain and for shipment for the account of Furber. On October 10, 1959 the grain was sold by defendant Furber to Clark Grain Company of Los Angeles, California. The total price of the grain was paid to Adams but he has refused to account for the balance of said sales price. No warehouse receipt was furnished on the transaction.

(7) On December 5, 1958 Adams entered into a Uniform Grain Storage Agreement with Commodity Credit covering the storage of grain at said warehouses. Beginning July, 1960 defendant Adams in violation of Oregon law and of the provisions of the Uniform Grain Storage Agreement, converted to his own use certain grain which had been stored with him under said Agreement at the Malone Siding warehouse and committed other breaches of the Agreement as set forth in the Pre-Trial Order.

The State Department of Agriculture of the State of Oregon, on account of apparent shortages of grain in the said warehouses operated by defendant Adams, suspended his warehouseman's license as of July 26, 1960.

### ISSUES

The principal issues of law and fact raised by the parties are:

#### I.

The jurisdiction of the Court.

#### II.

Whether the relationship between Adams and grain depositors was one of warehouseman and depositor, rather than that of vendor and purchaser or principal and factor.

#### III.

Whether the three state bonds should be construed as one continuous contract, rather than three separate and distinct bonds, one for each year.

#### IV.

Marshalling of assets as to defendant Commodity Credit Corporation.

### JURISDICTION

I. Defendants Long and Furber challenge the jurisdiction of the court to proceed with the trial of the case.

Assuming without deciding, that jurisdiction does not exist under the diversity statute, 28 U.S.C. § 1332, nor the interpleader statute, 28 U.S.C. § 1335, nor the declaratory judgment statute, 28 U.S.C. §§ 2201, 2202, nor Rule 22 F.R. Civ.P., I am of the opinion that the court has jurisdiction under the provisions of 15 U.S.C. § 714b(c)[2], by reason of the fact that Commodity Credit Corporation is a party defendant and has asked for affirmative relief in this proceeding. In construing similar laws the Federal courts have uniformly held that jurisdiction depends on the state of facts when the suit was commenced, rather than the status of the proceeding at a later date, and, that the court has jurisdiction under a factual situation similar to that with which we are here faced. Brelsford v. Whitney Trust & Savings Bank, 69 F.2d 491 (5 Cir., 1934); Saley v. Black Panther Oil & Gas Co., 280 F. 496 (8 Cir., 1922); Hood ex rel. North Carolina Bank & Trust Co. v. Bell, 84 F. 2d 136 (4 Cir., 1936). This would be true even though Commodity Credit Corporation might disclaim any interest in the res before the court. Brelsford v. Whitney Trust & Savings Bank, supra.

The specific statute was construed to the same effect in United States v. McDonald Grain & Seed Co., Inc. (D.C.N.D., 1957), 154 F.Supp. 329, reversed on other grounds, United States v. McCabe Co., Inc., 8 Cir., 261 F.2d 539. Furthermore, I believe jurisdiction exists under the interpleader statute and Rule 22 F.R.C.P.

## STATUS OF DEPOSITORS

II. It is conceded that Adams was a grain warehouseman as defined by the provisions of ORS 586.210(6)[3]. ORS 586.300 requires a grain warehouseman, such as Adams, to post a bond[4]. This section makes it clear that one of the principal purposes of the bonds is to protect those who have been issued bonded public warehouse receipts or load slips[5].

It was Adams duty to receive all grain offered for storage and to redeliver such grain within a reasonable time after demand. ORS 586.400. ORS 586.425 prohibits a warehouseman from acting in the dual capacity of warehouseman and purchaser without written instructions or order made a part of the warehouseman's records. ORS 586.425[6]. Each of the three bonds in question specifically recog-

---

2. "The Corporation

 \* \* \* \* \*

"(c) May sue and be sued, but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Corporation or its property. The district courts of the United States, including the district courts of any Territory or possession, shall have exclusive original jurisdiction, *without regard to the amount in controversy, of all suits brought by or against the Corporation: Provided,* That the Corporation may intervene in any court in any suit, action, or proceeding in which it has an interest. \* \* \*"

3. O.R.S. 586.210(6)

" 'Warehouseman' includes any person, existing legal entity or municipality *owning, operating* or controlling any public warehouse."

4. O.R.S. 586.300(2)

"The bond must be approved by the department and shall be conditioned upon faithful performance by the warehouse-

man of the acts and duties enjoined by law upon him as a warehouseman, and such further obligations as a warehouseman as he may lawfully assume under contracts with depositors of grain in his warehouse. The liability of the surety upon such bond is limited to the amount specified in the bond."

5. O.R.S. 586.300(5)

"The department may require the filing of an additional bond or bonds, within the limits stated in subsection (1) of this section, when it has knowledge of the principal's methods of conducting his business or of conditions affecting such business that, in the department's judgment, makes such increase advisable for the protection of holders of the bonded public warehouse's receipts or load slips."

6. O.R.S. 586.425

"(1) If adequate definite written instruction or order is given or furnished by the owner of grain, or his authorized agent, directed to a licensed warehouseman, and if such order is properly made

nizes that it was posted pursuant to the provisions of this Chapter of Oregon Laws dealing with the storage of grain [7].

■ We start with the premise that if there were *valid* sales to Adams the surety would be relieved of its obligation, under the bond, even though there was a failure to pay the purchase price. State ex rel. Cawrse v. American Surety Co., 148 Or. 1, 35 P.2d 487. We must keep in mind that this case was decided long prior to the enactment of ORS 586.425 which requires a written instruction or order before a sale to a warehouseman can be recognized. I shall later discuss the effect of this enactment [8].

■ A few rules of construction will be beneficial in arriving at a final conclusion on all points involved. First of all, contracts such as the bonds involved in this case must be construed according to the lex loci contractus. United States Fidelity & Guaranty Co. v. Vermont Marble Co., 16 F.2d 83 (7 Cir., 1926). Boseman v. Connecticut General Life Insurance Co. (1937) 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed. 1036. The plaintiff, being a paid surety, cannot invoke the doctrine of strictissimi juris. The provisions of the bond must be construed most strongly against it. American Radiator & Standard Sanitary Corporation v. L. L. Forbes Const. Co., 259 F.2d 147 (9 Cir., 1958). However, contract of suretyship is subject to the same rules of construction as any other contract to ascertain and give effect to the intention of the parties. National Surety Co. of New York v. Ulmen, 68 F.2d 330 (9 Cir., 1934) certiorari denied 292 U.S. 624, 54 S.Ct. 629, 78 L.Ed. 1479. Where a written instrument refers in specific terms to another writing as containing a part of the agreement, the other writing is itself a part of the contract between the parties. Cerino v. Oregon Physicians' Service, 202 Or. 474, 276 P.2d 397. The applicable law is part and parcel of every valid contract and such law is incorporated in and becomes an essential part of that contract. Ocean Accident & Guarantee Corp., Ltd. v. Albina Marine Iron Works, 122 Or. 615, 260 P. 229. Another way of stating the rule is that the law existing at the time and place of making a contract is as much a part thereof as though it was expressed therein. Florida Central Railway Co. v. Schutte, 103 U.S. 118, 26 L.Ed. 327; Farmers & Merchants Bank of Monroe v. Federal Reserve Bank, 262 U.S. 649, 43 S.Ct. 651, 67 L.Ed. 1157 (1923); General Electric Co. v. Moretz, 270 F.2d 780 (4 Cir., 1959). Surety Contracts, particularly those required by statute, must be strictly construed in favor of the obligors, McGrath v. Nolan, 83 F.2d 746 (9 Cir., 1936). The plaintiff stands in the shoes of Adams and the rules of evidence applicable to Adams would be applicable to plaintiff, as limited by the statutes in question. State, ex rel. Dyer v. Francis, 152 Or. 448, 54 P.2d 297. Gaussen v. United States, 97 U.S. 584, 24 L.Ed. 1009.

We can assume that ORS 586.425 was enacted to prevent abuses which develop when warehousemen find themselves in

---

a part of the warehouseman's records and available for department inspection, then the warehouseman:

"(a) May accept such deposit of grain for the purpose of sale to the warehouseman;

"(b) May receive such grain for the purpose of processing and cleaning; and

"(c) May receive such grain for the purpose of shipping by the warehouseman for the account of the depositor.

"(2) Grain deposited with a licensed warehouseman without written order, as provided for in subsection (1) of this section, must be handled and considered to be grain in storage and subject to all the provisions of this chapter and, except as provided in ORS 586.720, to the provisions of ORS chapter 74."

**7.** Typical language:

"That William P. Adams, an individual doing business under the firm name and style of Adams Seed Company * * *, as principal and United States Fidelity and Guaranty Company as surety, are held and firmly bound as *required by ORS, Chapter 586 unto the State of Oregon in the full penal sum of * * *"

**8.** Chapter 11, Oregon Laws, 1957, § 4. ORS 586.425.

·difficulty and then make claims that they were orally authorized to dispose of particular lots of grain. The court could almost take judicial notice of the many times this claim has been made in warehouse failures.

On the issue of the force and effect of this statute, the plaintiff is in exactly the same position as Adams, in that, the statute must be read into the surety bond. In giving effect to the language of ORS 586.425, which prohibits the sale by a depositor to a warehouseman without written order or instructions, we must keep in mind that the clear language of a statute cannot be restrained by any consideration of supposed wisdom or policy, and so long as the legislative enactment violates no constitutional provision or principle it must be deemed its own conclusive evidence of the justice, propriety and policy of its passage. State v. Blount, 200 Or. 35, 264 P.2d 419. The object and the purpose of the law is something which must always be considered. Campbell v. City of Eugene, 116 Or. 264, 240 P. 418. The declaration of the Oregon Legislature that grain deposited with a licensed warehouseman, without a written order, must be handled and considered to be grain in storage should be accepted as the public policy of that state. Camas Stage Co., Inc. v. Kozer, 104 Or. 600, 209 P. 95, 25 A.L.R. 27. Leonard v. Ekwall, 124 Or. 351, 264 P. 463. Plaintiff urges that defendants Gray, Furber, Largent, Liskey Farms, Regis Andrieu, George Denault, George Andrieu, and Leon Andrieu sold their grain to Adams and that under the generally accepted rule the plaintiff, as surety, would not be liable for payment of the balance of the purchase price. It is said that the depositors, by their actions in receiving certain payments and in instituting certain actions against Adams claiming a sale and securing judgments in such actions, waived their rights to claim the benefits of the statute requiring written instructions or orders before a licensed warehouseman could enter into a valid contract of sale.

Furthermore, it is plaintiff's position that defendant Adams in attempting to purchase this grain, acted in his individual capacity, instead of in his capacity as a warehouseman. It is then argued that the statute in question does not cover a situation where a public warehouseman buys and sells grain on his own personal account. I disagree. The whole purpose of the statute was to require a public warehouseman, individual or corporate, to secure a written instruction or an order from the depositor before making a purchase. If he did not receive such an instruction or an order, the grain so deposited was for storage. To follow the plaintiff's argument to its ultimate conclusion would be to entirely circumvent the obvious purpose of the statute. Plaintiff, as another alternative, contends that the statute was enacted solely to assist the Oregon State Department of Agriculture in making a routine inspection of grain warehouses throughout the State. In other words, it is argued, that the statute was a mere "strawman" to assist the investigators for the Department in determining the total wheat on storage. Plaintiff argues that the statute has no application whatsoever to the every day operation of a warehouseman's business and that he can completely ignore the requirements of the statute and purchase the depositor's grain without written order. It is inconceivable that the Oregon Legislature had any such intention. A licensed public warehouseman holds a rather unique position. He is a trustee in the broadest sense of the word. Sound public policy requires that he act first as a licensed trustee of the public, and, if he acts in any other capacity, he must do so under such restrictions as may be placed upon him by the Legislature.

The courts have uniformly enforced statutes which require written documentation of certain transactions, such as the Statute of Frauds and the statute defining the Parole Evidence Rule. Reason and logic dictate that the requirements of the challenged statute are as urgent as

those of the other statutes just mentioned.

In my opinion, the Supreme Court of Oregon, if faced with the precise problem, would hold that the statute conclusively establishes the rights between the parties and that grain deposited in a public warehouse is placed there for storage only, unless it is shown that the depositor signed a written order or instruction pursuant to the statute. Of course, there can be no recovery on that grain for which the warehouseman has paid the depositor.

On plaintiff's contention that defendants waived the provisions of the statute, I find that there is no evidence of a waiver of a known right. The complaint of the defendant Gray is clearly based on a theory of conversion. There is no mention of a sale in that complaint. The other complaints might well be construed as complaints on *quantum valebant* for the reasonable value of goods converted. The fact that the sale is mentioned in the complaints is not conclusive. In any event, the filing of these complaints and the prosecution of some to judgment do not, in themselves, constitute waivers of the specific requirements of the statute in question. A waiver of a legal right results only where there is both full knowledge of all of the facts and the existence of the right of election coupled with an intention to relinquish it. Stanley v. Mueller, 222 Or. 194, 350 P.2d 880; Smith v. Hyett, 131 Or. 1, 281 P. 826.

A far more serious problem is that created by the taking of chattel mortgages and the taking of possession, with the consent of Adams, of the warehouse on railroad property in Macdoel, California by the defendants, Andrieus' and Denault. The record would indicate that this property has a substantial value and would be sufficient to pay a sizeable sum on these claims. The principles of estoppel, under some circumstances, might well apply to these defendants.

However, the record discloses that these depositors offered this security to the plaintiff, and, in such case, the plaintiff should not be permitted to claim an estoppel. After all, if the plaintiff pays these claims it will be subrogated, as a matter of law, to rights of these defendants in that security. The essential elements of an estoppel are missing. The plaintiff has not changed its position, nor has it been affected in any way by these actions of the defendants. The taking of a written obligation from the principal, by a depositor, does not preclude the depositor from recovering on the bond, in the absence of a special agreement that the instrument should be accepted in absolute payment of the obligation. The presumption is that it was accepted on condition that it should itself be paid. Christensen, Inc. v. Hansen Construction Co., 142 Or. 549, 553, 21 P.2d 195. Of course, the depositor is bound to exercise due care in preserving, applying and disposing of any security for the benefit of the surety. Cottage Grove Lumber Co. v. Lillegren, 227 Or. 24, 32, 360 P.2d 927.

## STATUS OF STATUTORY BONDS

III. It is plaintiff's contention that the three statutory bonds constituted but one contractual coverage commencing July 1, 1958 in the penal sum of $5,000.00, raised to $9,500.00 as of July 30, 1959, and reduced to $9,000.00 on July 1, 1960. The court takes judicial notice of the fact that "grain" as defined by ORS 586.210, consisting of wheat, corn, oats, barley, rye and other grains, *means annual crops*, stored annually during the harvesting season, generally harvested after July 1st and moved through the warehouse before the harvest of the next crop. ORS 586.300 required each warehouseman operating a public warehouse to post a new bond on or before *July 1st of each year*. The amount of the bond each year to be fixed by a schedule established by the State Department of Agriculture. On July 30, 1959 Adams and plaintiff entered into an agreement which was to be at-

tached as a rider to the bond dated July 1, 1959 [9]. Plaintiff urges that this writing indicates an intention to limit the liability on the bonds and to make the arrangement one of continuous contract rather than three separate bonds. Aside from the statute itself, the provisions of the bonds quoted in the margin demonstrate, beyond question, that the parties intended a separate and distinct bond for each crop year [10], rather than one continuous bond as urged by plaintiff. That plaintiff was fully aware of the fact that a separate bond had to be furnished each year is clearly indicated by the endorsement [11] on the reverse side of each bond.

The bond that became effective on July 1, 1959, was actually executed on June 18th and the rider, in question, was not executed until July 30th of that year. Clearly, the main purpose of the rider was to include an additional warehouse and to increase the coverage from $5,000.00 to $9,500.00, in order that each warehouse might have adequate coverage. The parties were speaking only of the specific bond when they agreed that plaintiff was not to be liable for an amount greater than $5,000.00 for any defaults prior to July 30, 1959. It seems clear that the real object of this instrument was to preclude a construction which might make the bond carry a penal sum of $14,500.00 during the period July 30, 1959 to June 30, 1960. In any event, the rider cannot be construed to overcome the fact that three bonds were in reality executed by the parties and approved by the State Department of Agriculture, nor can the rider be construed to abrogate and nullify the specific language of the bonds.

Cases such as New York Casualty Co. v. Ford, 145 F.2d 599 (5 Cir., 1944); Brulatour v. Aetna Casualty & Surety Co., 80 F.2d 834 (2 Cir., 1936); United States Fidelity & Guaranty Co. v. Barber, 70 F.2d 220 (6 Cir., 1934); Aetna Casualty & Surety Co. v. First National Bank of Weatherly, 103 F.2d 977 (3 Cir., 1939); Montgomery Ward & Co., v. Fidelity & Deposit Co. of Maryland, 162 F.2d 264 (7 Cir., 1947) cited by plaintiff in support of its contention that only one bond is involved are, simply stated, inapposite. Most of the cases cited by plaintiff involve a non-statutory bond with the provision for payment of an annual premium and a renewal on the payment of such premium. In none of the cases did a statute require the execution, delivery and approval by state authority of an annual bond. In none of the cases was more than one bond actually executed. The instruments construed in those cases were issued for an indefinite term, to be renewed on payment of the annual premium. Making plaintiff's cases clearly distinguishable is the fact that each of the bonds here in question was for a definite period of time. Plaintiff's cases are of no assistance in arriving at a proper conclusion.

In the last analysis, the court must be governed by the intention of the parties when the bonds were executed, and the

9. "It is further understood and agreed that on and after July 30, 1959, the surety's total liability shall be $9,500.00 but prior to that date, the surety shall not be liable for an amount greater than $5,000.00.

"It is further understood and agreed that the attached bond as amended by this rider shall be subject to all its agreements, limitations and conditions, and that the liability of the surety under the attached bond and under the attached bond as amended by this rider shall not be cumulative, except that regardless of any liability which may arise out of defaults occurring prior to July 30, 1959, the aggregate liability of the surety after that date shall be $9,500.00."

10. (First Bond)
"This bond covers the period commencing July 1, 1958, and ending June 30, 1959."
(Second Bond)
"This bond covers the period commencing July 1, 1959, and ending June 30, 1960."
(Third Bond)
"This bond covers the period commencing July 1, 1960, and ending June 30, 1961."

11. "ORS *586.300 requires a bond* to be given by all public grain warehouses *on or before the 1st day of July of each year*." (Emphasis supplied)

language of the statute. A common sense interpretation of the language of the bonds, the peculiar risk involved [12] and the specific language of the statute can lead to no conclusion other than all parties intended to execute and approve three separate and distinct bonds.

At first glance it might seem that Farmers' Co-op. Mercantile & Shipping Ass'n v. National Surety Co. (D.C.Kan.) 17 F.2d 527 is in point. However, in that case there was only one bond which was renewable from year to year on payment of the annual premium. The bond was not required by statute.

Cases such as Jaeger Manufacturing Co. v. Massachusetts Bonding and Insurance Co., 229 Iowa 158, 294 N.W. 268, holding that obligations on a bond required by a statute are measured by the particular statute requiring the bond, are much more in point and indicate that plaintiff is liable on three separate and distinct bonds, rather than one continuing bond. I so find.

The Supreme Court of Oregon, in my opinion, if faced with this problem would undoubtedly hold that the statute required, and the parties executed three separate and distinct bonds.

 In my opinion, and I find, the grain was used by Adams shortly after deposit in each year. A demand for a return of the grain would be futile. There is substantial evidence that none of this grain, so deposited at the time of harvest, was on hand at the end of the bond year on June 30th, except the grain of Long. The claim of each depositor, except Long, would be against the bond posted in the year in which the particular deposit was made. Hence, the claims of defendants Andrieus', Denault and Furber would be under the bond ending June 30, 1959, the claims of defendants Liskey Farms, Inc., Gray in full, and Long in part, under the bond ending June 30, 1960, and the claim of defendant Largent, and the balance of the claim of Long, under the bond ending June 30, 1961. I withhold discussion on the claim of the Commodity Credit Corporation until I have discussed the issue of whether the doctrine of marshalling of assets should be applied in connection with the claims of said defendant. The amounts of the respective claims are set forth in the Agreed Statement of Facts. Where the total of the claims exceed the amount of the bond ending June 30, 1959, those parties are entitled to judgment in proportion to the amount of their claim as limited by the penal sum of the bond. The plaintiff had the burden of showing when Long's grain was converted and since it has failed to assume such burden, Long's claim is properly allowable against two bonds, that ending June 30, 1960 and that ending June 30, 1961. Interest is recoverable at 6% from June 30th in the year in which the recovery is allowed. Equity would require the offset of storage to the end of the bond year.

## MARSHALLING OF ASSETS

██ IV. The details of the arrangement between Adams and the Commodity Credit Corporation (CCC) are covered by the Uniform Grain Storage Agreement dated December 5, 1958. The record shows that the claims of the CCC are based on warehouse receipts issued prior to July 1st, 1960. Since the plaintiff and defendant, CCC, have agreed in their Briefs, and, contentions before this court, that this claim is a proper one against the bond ending June 30, 1961, and, the total of the principal claims of CCC and Largent and the balance of the Long claim, would exceed the $9,000.00 penal sum of the bond, it would seem that a discussion of the above subject is required. Moreover, we must keep in mind that claims for unearned warehouse charges and for recovery of freight charges paid are part of the claims of CCC against the plaintiff, and that such claims might be allowed on appeal. Consequently, it would seem expedient that I pass on the question of the marshalling of assets. Earlier in this opinion, I called attention to the fact that the Uniform Storage Agreement was secured by a con-

12. Protection of depositors of grain stored annually.

tractual, as distinguished from a statutory, bond issued by plaintiff to CCC alone. Thus, it is manifest that there are two bonds to which, under ordinary circumstances, the CCC could look for satisfaction. The other depositors have no right of recovery under the contractual bond but must rely on the statutory bonds. Generally, when two creditors seek satisfaction out of the assets of a debtor and one of them can resort to two funds and the other is limited to one, the former may be required to seek satisfaction out of the fund which the latter creditor cannot touch, so that the latter may have his claim satisfied out of the fund which is subject to the claims of both. Carnes v. Manning, 118 Or. 665, 683, 248 P. 137; First National Bank of Portland v. Connolly, 172 Or. 434, 494, 138 P.2d 613, 143 P.2d 243. In the application of the doctrine, the United States and, accordingly its agencies, are on an equal basis with other creditors. United States v. Lord, 155 F.Supp. 105, 110 (D.C.N.H.1957); In re Ann Arbor Brewing Co., 110 F.Supp. 111 (D.C.E.D. Mich.1951). This is a proper case for use of the doctrine in question.

If the claims of CCC and Largent, and the balance of the Long claim not satisfied under the 1959 bond, are in excess of the penal sum of the statutory bond ending June 30, 1961, CCC will be required to look to its contractual bond for a sum sufficient to permit Largent and Long a recovery in full under said statutory bond.

## ATTORNEY FEES

■ Plaintiff seeks the allowance of a substantial sum as attorney fees for instituting this action. Attorney fees may be allowed to a stake holder in connection with placing a fund in court for distribution. In the Ninth Circuit, and others, the allowance of costs, including attorney fees, is a matter within the discretion of the trial court. Bank of China v. Wells Fargo Bank & Union Trust Co., 209 F.2d 467, 476, 48 A.L.R.2d 172 (9 Cir., 1953). The extent of the allowance, if any, depends on the value of the services rendered by the attorney to the court and to the other parties involved. Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184; City of Wewoka, Okl. v. Banker, 117 F. 2d 839 (10 Cir., 1941). The discretion vested in the court should never be exercised in a case where the interest of the party whose funds are sought to be charged are antagonistic to the party for whose benefit the suit is prosecuted. Caine v. Payne, 89 U.S. App.D.C. 260, 191 F.2d 482, 483 (D.C.Cir., 1951). With minor exceptions, I find that the position of the plaintiff has been completely and unalterably opposed to the contentions of the defendants. This being so, plaintiff is not entitled to an attorney fee out of the fund. The entire services rendered by plaintiff's attorneys would certainly justify an attorney fee of $1,500.00, the amount claimed, and if the Court of Appeals arrives at a conclusion that plaintiff is correct in its contentions, I would find that said sum was reasonable. I say nothing on the allowance of attorney fees to defendants. No question is raised on that point in the issues created by the Pre-Trial Order.

## ALTERNATE FINDINGS

If it was not for the public policy of the State of Oregon as declared in ORS 586.425, and the positive requirements of said statute, which I find should be read into each statutory bond, I would find that all defendants, with the exception of CCC and Long, sold their grain to Adams and under the doctrine as taught in State ex rel. Cawrse v. American Surety Co., supra, could not recover from the plaintiff.

I find against the plaintiff and in favor of the defendants to the extent indicated in this Opinion. The Agreed Facts and this Opinion shall stand as my findings and conclusions. A Decree in conformity with this Opinion shall be prepared within ten days from the date hereof. Ruling is reserved on the segregated issue of liability raised by defendant CCC on the bond of the plaintiff covering the operation of Adams at its warehouse in Macdoel, California.